## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 13-20315 CR-LENARD

18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 2
18 U.S.C. § 982

MAGISTRATE JUDGE
O'SULLIVAN

**UNITED STATES OF AMERICA**

**vs.**

**EMILIO AMADOR,**
**CRISTOBAL GONZALEZ,**
**EDUIMS MORA,**
**JOSE CONTRERAS,**
**and**
**ELIZABETH MONTEAGUDO,**



FILED by _____ D.C.

MAY 07 2013

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

                        **Defendants.**
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.     "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4.     Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services.

5.     CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs.  CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States.  In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims.  As administrator, Palmetto was to receive, adjudicate and pay claims submitted by HHA providers under the Part A program for home health claims.

## Part A Coverage and Regulations

### Reimbursements

6.      The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits.  A patient qualified for home health benefits only if:

    a.      the patient was confined to the home, also referred to as homebound;

    b.      the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

    c.      the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.      HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care."  The base payment was adjusted based on the health condition and care needs of the beneficiary.  This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition.  If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence.  There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8.     In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered.  At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be made.  As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm.  Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

### Record Keeping Requirements

9.     Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10.     Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services,

and an OASIS.

11. Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

### Special Outlier Provision

12. Medicare regulations allowed certified home health agencies to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified home health agency. That certified home health agency would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees. However, Medicare regulations prohibit one home health agency merely serving as a billing mechanism for another agency.

13. For insulin-dependent diabetic beneficiaries, Medicare paid for insulin injections by an HHA when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary. Additionally, for beneficiaries for whom occupational or physical therapy was medically

necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14.    While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries who had the most extensive care needs, which may result in an Outlier Payment to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

### Caring Nurse Home Health, Corp.

15.    Caring Nurse Home Health, Corp. (Caring) was a Florida corporation incorporated on or about December 18, 2003, that did business in Miami-Dade County, Florida, as an HHA that purported to provide home health care and physical therapy services to eligible Medicare beneficiaries. Caring was located at 6704 NW 72nd Avenue, Miami, Florida. Caring was owned and operated by Rogelio Rodriguez.

16.    On or about September 14, 2005, Caring obtained Medicare provider number 10-8188, authorizing Caring to submit claims to Medicare for HHA-related benefits and services.

17.    From in or around January 2006, through in or around January 2010, Caring submitted claims to the Medicare program for approximately $47 million in home health services that Caring purportedly provided to approximately 965 beneficiaries. As a result of the

submission of these claims, Medicare, through Palmetto, paid approximately $31 million to Caring.

### Good Quality Home Health, Inc.

18.     Good Quality Home Health, Inc. (Good Quality) was a Florida corporation incorporated on or about February 7, 2008, that did business in Miami-Dade County, Florida, as an HHA that purported to provide home health care and physical therapy services to eligible Medicare beneficiaries. Good Quality was located at 2100 West 76th Street, Suite 406, Hialeah, Florida. Good Quality was owned and operated by Rogelio Rodriguez and Raymond Aday.

19.     On or about May 11, 2009, Good Quality obtained Medicare provider number 10-9198, authorizing Good Quality to submit claims to Medicare for HHA-related benefits and services.

20.     From in or around October 2009, through in or around June 2011, Good Quality submitted claims to the Medicare program for approximately $1.5 million in home health services that Good Quality purportedly provided to approximately 338 beneficiaries. As a result of the submission of these claims, Medicare, through Palmetto, paid approximately $2.1 million to Good Quality.

### The Defendants and Related Companies

21.     Defendants **EMILIO AMADOR, CRISTOBAL GONZALEZ, EDUIMS MORA, JOSE CONTRERAS** and **ELIZABETH MONTEAGUDO** were residents of Miami-Dade County, Florida.

22.     Defendant **EMILIO AMADOR** was the owner of Statewide Marketing, Inc. (Statewide Marketing), a corporation organized under the laws of the State of Florida which purportedly did business at 16426 SW 50 Ter., Miami, Florida, 33185.

23.     Defendant **EMILIO AMADOR** was the owner of 24 Hour On Call Services, Inc. (24 Hour On Call), a corporation organized under the laws of the State of Florida which purportedly did business at 16426 SW 50 Ter., Miami, Florida, 33185.

24.     Defendant **EMILIO AMADOR** was the owner of E & A Holding Services, Inc. (E&A Holding), a corporation organized under the laws of the State of Florida which purportedly did business at 16426 SW 50 Ter., Miami, Florida, 33185.

25.     Defendant **CRISTOBAL GONZALEZ** controlled Florida Network Providers, Inc. (Florida Network Providers). Florida Network Providers was a corporation organized under the laws of the State of Florida which purportedly did business at 9737 NW 41 St., Ste. 761, Doral, Florida, 33178.

26.     Defendant **CRISTOBAL GONZALEZ** controlled Global NC Solutions, Inc. (Global NC Solutions). Global NC Solutions was a corporation organized under the laws of the State of Florida which purportedly did business at 9737 NW 41 St., Ste. 719, Doral, Florida, 33178.

27.     Defendant **CRISTOBAL GONZALEZ** was the owner of Quality Caring, Inc. (Quality Caring), a corporation organized under the laws of the State of Florida which purportedly did business at 9737 NW 41 St., Ste. 761, Doral, Florida, 33178.

28.     Defendant **EDUIMS MORA** was the owner of E.M. Angel Corporation, Inc. (E.M. Angel), a corporation organized under the laws of the State of Florida which purportedly did business at 560 East 58 St., Hialeah, Florida, 33013.

29.     Defendant **JOSE CONTRERAS** was the owner of Vinales Services, Inc. (Vinales Services), a corporation organized under the laws of the State of Florida which purportedly did business at 3660 SW 9 Ter., Miami, Florida, 33135.

30. Defendant **ELIZABETH MONTEAGUDO** was the owner of EMF Services, Corp. (EMF Services), a corporation organized under the laws of the State of Florida which purportedly did business at 16620 SW 293 Ter., Homestead, Florida, 33033.

## COUNT 1
### Conspiracy to Defraud the United States and to Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1. Paragraphs 1 through 30 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. From in or around January 2006, and continuing through in or around June 2011, the exact dates being unknown to the Grand Jury, at Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**EMILIO AMADOR,**
**CRISTOBAL GONZALEZ,**
**EDUIMS MORA,**
**JOSE CONTRERAS,**
**and**
**ELIZABETH MONTEAGUDO,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Rogelio Rodriguez, Raymond Aday and others known and unknown to the Grand Jury, to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program; and to commit certain offenses against the United States, that is: to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including any kickback and bribe, directly and indirectly, overtly and covertly, in cash and in kind, including by check, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service

for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

## PURPOSE OF THE CONSPIRACY

3.     It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (1) paying and accepting kickbacks and bribes for referring Medicare beneficiaries to Caring and Good Quality so that their Medicare beneficiary numbers would serve as the bases of claims filed for home health care; and (2) submitting and causing the submission of claims to Medicare for home health services that the co-conspirators purported to provide to those beneficiaries.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.     **EMILIO AMADOR, CRISTOBAL GONZALEZ, EDUIMS MORA, JOSE CONTRERAS** and **ELIZABETH MONTEAGUDO** accepted kickbacks from Caring and Good Quality in exchange for recruiting Medicare beneficiaries to be placed at Caring and Good Quality, while knowing that Caring and Good Quality would in turn bill Medicare for home health services purportedly rendered for the recruited Medicare beneficiaries.

5.     **EMILIO AMADOR, CRISTOBAL GONZALEZ, EDUIMS MORA, JOSE CONTRERAS** and **ELIZABETH MONTEAGUDO** caused Caring and Good Quality to submit claims to Medicare for home health services purportedly rendered to Medicare beneficiaries.

6.     **EMILIO AMADOR, CRISTOBAL GONZALEZ, EDUIMS MORA, JOSE CONTRERAS** and **ELIZABETH MONTEAGUDO** caused monies to be paid by Medicare to Caring and Good Quality based upon the claims for home health services alleged to have been

rendered to Medicare beneficiaries.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.       On or about July 10, 2008, defendant **ELIZABETH MONTEAGUDO** incorporated EMF Services.

2.       On or about January 12, 2009, defendant **EDUIMS MORA** incorporated E.M. Angel.

3.       On or about January 14, 2009, defendant **JOSE CONTRERAS** incorporated Vinales Services.

4.       On or about February 23, 2009, defendant **EMILIO AMADOR** incorporated Statewide Marketing.

5.       On or about April 14, 2009, **ELIZABETH MONTEAGUDO** deposited and caused to be deposited Caring check #07230 in the amount $11,007 into EMF Services' corporate bank account at Wachovia.

6.       On or about April 30, 2009, **CRISTOBAL GONZALEZ** received and cashed Caring check #07670 in the amount of $11,900 at Bank of America.

7.       On or about July 9, 2009, **EDUIMS MORA** deposited and caused to be deposited Caring check #10136 in the amount of $10,200 into E.M. Angel's corporate bank account at Bank of America.

8.       On or about July 28, 2009, **EMILIO AMADOR** deposited and caused to be deposited Caring check #10707 in the amount of $28,400 into 24 Hour On Call's corporate bank account at Wells Fargo Bank.

9.      On or about November 25, 2009, **JOSE CONTRERAS** deposited and caused to be deposited Caring check #16244 in the amount of $13,400 into Vinales Services's corporate bank account at Bank of America.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 2-11
**Receipt of Kickbacks in Connection with a Federal Health Care Program**
**(42 U.S.C. § 1320a-7b(b)(1)(A))**

1.      Paragraphs 1 through 30 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates enumerated below, at Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**EMILIO AMADOR,**
**CRISTOBAL GONZALEZ,**
**EDUIMS MORA,**
**JOSE CONTRERAS,**
**and**
**ELIZABETH MONTEAGUDO,**

did knowingly and willfully solicit and receive any remuneration, including any kickback and bribe, directly and indirectly, overtly and covertly, in cash and in kind, including by check, as set forth below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare:

| Count | Defendant | Approximate Date | Approximate Amount of Kickback |
|-------|-----------|------------------|-------------------------------|
| 2 | **EMILIO AMADOR** | 7/28/2009 | $28,400 |
| 3 | **EMILIO AMADOR** | 8/14/2009 | $27,990 |
| 4 | **CRISTOBAL GONZALEZ** | 4/30/2009 | $11,900 |
| 5 | **CRISTOBAL GONZALEZ** | 12/04/2009 | $19,100 |
| 6 | **EDUIMS MORA** | 7/09/2009 | $10,200 |
| 7 | **EDUIMS MORA** | 10/15/2009 | $17,300 |
| 8 | **JOSE CONTRERAS** | 6/30/2009 | $13,250 |
| 9 | **JOSE CONTRERAS** | 11/25/2009 | $13,400 |
| 10 | **ELIZABETH MONTEAGUDO** | 4/14/2009 | $11,007 |
| 11 | **ELIZABETH MONTEAGUDO** | 5/28/2009 | $10,000 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

## CRIMINAL FORFEITURE
### (18 U.S.C. § 982)

1.      The allegations contained in this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purposes of alleging forfeiture to the United States of America of certain property in which the defendants, **EMILIO AMADOR, CRISTOBAL GONZALEZ, EDUIMS MORA, JOSE CONTRERAS** and **ELIZABETH MONTEAGUDO** have an interest.

2.      Upon conviction of a violation of, or a conspiracy to violate, Title 42, United States Code, Section 1320a-7b, as alleged in Count 1 of this Indictment, the defendants shall forfeit all of their right, title and interest to the United States in property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violations, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      If any of the property described above, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(I).

A TRUE BILL

_____
FOREPERSON

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BEN SINGER
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JOSEPH S. BEEMSTERBOER
ASSISTANT CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

EMILIO AMADOR, ET AL.

**Defendants.**

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division**: (Select One)

| | |
|---|---|
| X   Miami | ___   Key West |
| ___   FTL | ___   WPB       ___   FTP |

New Defendant(s)                Yes ___   No ___
Number of New Defendants
Total number of counts          ___

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:      (Yes or No)        Yes
     List language and/or dialect        Spanish

4.   This case will take    10    days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

(Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0  to  5 days | | | | |
| II | 6  to 10 days | X | Minor | Petty | |
| III | 11 to 20 days | | | Misdem. | |
| IV | 21 to 60 days | | | Felony | X |
| V | 61 days and over | | | | |

(Check only one)

6.   Has this case been previously filed in this District Court?  (Yes or No)    No
     If yes:
     Judge: _____   Case No. _____
     (Attach copy of dispositive order)
     Has a complaint been filed in this matter?      (Yes or No)    No
     If yes:
     Magistrate Case No. _____
     Related Miscellaneous numbers: _____
     Defendant(s) in federal custody as of _____
     Defendant(s) in state custody as of _____
     Rule 20 from the _____   District of _____

     Is this a potential death penalty case? (Yes or No)    No

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to  October 14, 2003?  ___ Yes   X   No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?  ___ Yes   X   No

_____
JOSEPH BEEMSTERBOER
SENOR TRIAL ATTORNEY
Court No. A5501439

*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name: EMILIO AMADOR**

**Case No:**

Count #: 1

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty:**      Five (5)  years' imprisonment

Counts  #: 2 - 3

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A))

**\*Max. Penalty:**      Five (5) years' imprisonment as to each count

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** **CRISTOBAL GONZALEZ**

**Case No:**

Count #: 1

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty:**        Five (5) years' imprisonment

Counts #: 4 - 5

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A))

**\*Max. Penalty:**        Five (5) years' imprisonment as to each count

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name: EDUIMS MORA**

**Case No:**

Count #: 1

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty:**        Five (5)  years' imprisonment

Counts #: 6 - 7

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A))

**\*Max. Penalty:**        Five (5) years' imprisonment as to each count

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** **JOSE CONTRERAS**

**Case No**:

Count  #: 1

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty**:       Five (5)  years' imprisonment

Counts  #: 8 - 9

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A))

**\*Max. Penalty**:       Five (5) years' imprisonment as to each count

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name: ELIZABETH MONTEAGUDO**

**Case No:**

Count #: 1

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty:**       Five (5) years' imprisonment

Counts #: 10 - 11

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A))

**\*Max. Penalty:**       Five (5) years' imprisonment as to each count